UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

REPORT AND
RECOMMENDATION

v.

ANTONIO ARENA,                                    21-MJ-671-MJP

                        Defendant

**APPEARANCES**

For the government:                       Everardo A. Rodriguez
                                          Katelyn M. Hartford
                                          Assistant U.S. Attorneys
                                          U.S. Attorney's Office – Rochester
                                          100 State Street
                                          Rochester, NY 14614

For the defense:                          Anne M. Burger
                                          Assistant Federal Public Defender
                                          28 East Main Street Suite 400
                                          Rochester, NY 14614

**INTRODUCTION**

**Pedersen M.J.** Before the Court is the government's memorandum in support
of an Order seeking involuntary medication of an incompetent individual in the hope
that he may regain competency to stand trial. (ECF No. 61.) The Court conducted a
*Sell* hearing[1] over six days that involved doctors from Federal Medial Center Devens
(Drs. Dean Cutillar and Mariam Kissin), located in Fort Devens, Massachusetts, as
well as Dr. Rory Houghtalen, Mr. Arena's psychiatric expert and former psychiatric
expert for the government. (Minute Entries, ECF Nos. 45, 46, 47, 51, 52, 55.).

---

[1] *See Sell v. United States*, 539 U.S. 166 (2003).

Following the hearing, the parties filed post-hearing memoranda. (Memo in Supp., ECF No. 61; Memo in Opp., ECF No. 63.) After considering the information from the hearing and the submissions, and for the reasons stated below, the undersigned issues this Report and Recommendation that the district judge deny the government's motion.

## PROCEDURAL BACKGROUND

This case commenced with a criminal complaint filed on August 25, 2021, charging Mr. Arena as follows:

> On or about August 24, 2021, in the Western District of New York, the defendant, ANTONIO ARENA, knowingly and willfully transmitted in interstate commerce, that is, by telephone call, a communication which contained a threat to injure the person of another in violation of Title 18, United States Code, Section 875(c). Further, on or about August 24, 2021, in the Western District of New York, the defendant, ANTONIO ARENA, threatened to assault and murder a federal officials, namely a Member of the United States Congress, with intent to impede, intimidate, and interfere with the federal official while he was engaged in his official duties and to retaliate against said federal official on account of the performance of his official duties, in violation of Title 18, United States Code, Section 115(a)(1)(B).

(Compl. at 1, ECF No. 1.) Pursuant to Federal Rule of Criminal Procedure 5, Mr. Arena made his initial appearance before the undersigned on August 26, 2021, and the government moved for detention. At the request of both parties, the undersigned did not hold a detention hearing, but issued an Order for a psychiatric evaluation per 18 U.S.C. § 4241. Following that evaluation, the undersigned held a competency hearing on November 30, 2021, and determined Mr. Arena was not competent to stand trial. The undersigned committed Mr. Arena to the custody of the Attorney General per 18 U.S.C. § 4241(d) for possible restoration to competency.

Although the pending motion for forced medication is not dispositive in nature, because the undersigned recommends that the motion be denied, if adopted by the district judge, it has the practical effect of ending the criminal prosecution. Accordingly, the undersigned issues this Report and Recommendation rather than a Decision and Order.

On September 1, 2021, defense counsel moved the Court for an order to determine Mr. Arena's mental competency pursuant to 18 U.S.C. § 4241. (Notice of Mot. for Competency Determination, ECF No. 5.) In support of the motion, defense counsel noted that Mr. Arena had a long-term history of mental illness, and his insight and judgment were described as "limited" and "fair." (Burger Aff. ¶ 5, ECF No. 5, Sept. 1, 2021, citing *Arena v. Astrue*, No. 07-CV-6218-CJS, 2009 WL 497635, at *2–4 (W.D.N.Y. 2009).) Defense counsel also observed that in early 2003, Mr. Arena was hospitalized for a "mental status change" and was later referred for counseling at Rochester Mental Health. (Burger Aff. ¶ 5.) A therapist at that time diagnosed him with "depressive disorder and personality disorder and recommended a treatment plan that included psychotherapy, a psychiatric evaluation, and medication management." *Arena*, 2009 WL 497635 at *4. He was prescribed psychotropic medications. (*Id*.)

On September 7, 2021, the government informed the Court that it did not oppose an order directing a competency determination be made and it further agreed that due to the length of time it would take for Mr. Arena to be transported to the Bureau of Prisons ("BOP") for the evaluation, the evaluation could occur "locally by a

qualified professional." (Gov't Mem. in Resp. to Mot. for Competency Evaluation at 2, ECF No. 9.) On September 29, 2021, the Court granted the motion and ordered the examination, and a competency hearing was set to take place on November 16, 2021. (Order for Psychiatric/Psychological Examination, ECF No. 12.)

The government retained forensic psychiatrist Rory Houghtalen, M.D.[2] to conduct the competency evaluation. Dr. Houghtalen concluded that Mr. Arena was not competent and produced a November 10, 2021, report "Houghtalen Report on Competency," that the government subsequently adopted on November 24, 2021. (Gov't Mem. in Resp. to the Report on the Def.'s Competency Evaluation at 1, ECF No. 15.)

Dr. Houghtalen concluded Mr. Arena was most likely suffering from schizophrenia and summarized that he was "a middle-aged man harboring a longstanding, fixed delusion that is accompanied by auditory hallucinations and a disorder of thought and speech that includes neologisms.[3] He has no available insight, and his judgment and social function are clearly eroded." (Defense Hearing Exhibit H, Houghtalen Report on Competency at 7 (on file with the Court).) Dr. Houghtalen reported that Mr. Arena's delusions focused on the government as the cause of his

---

[2] Dr. Houghtalen's curriculum vitae was received in evidence as Defense Exhibit 1 during a December 1, 2022, *Sell* hearing. (On file with the Court.)

[3] "Psychiatry. A nonsense word interpolated in an otherwise correct sentence by a person suffering from a neuropsychiatric disorder, esp. schizophrenia." "neologism, n.". OED Online.    March    2023.    Oxford    University    Press. https://www.oed.com/view/Entry/126040?redirectedFrom=neologism (accessed May 31, 2023).

woes. (*Id*. at 3, 5, 6.) Regarding Mr. Arena's medical history, Dr. Houghtalen noted that:

> [t]he available records do not provide an inclusive medical history. He told me he was injured in a motor vehicle accident in his twenties during which he suffered a significant closed head injury. He reports various musculoskeletal pain problems, hypertension and reflux disease. Sleep apnea was treated with a Continuous Positive Airway Pressure (CPAP) device, but he has not had access to the treatment during the current incarceration.

*(Id*. at 4.) Considering Dr. Houghtalen's opinions, the government argued that the Court should issue an order pursuant to 18 U.S.C. § 4241(d) remanding Mr. Arena to the Attorney General for a determination as to whether he could be restored to competency. (Gov't Mem. in Resp. to the Report on the Def.'s Competency Evaluation at 2, ECF No. 15.)

Although Dr. Houghtalen had concluded that antipsychotic medication "could" assist in the restoration process, he was "much less optimistic" that psychotropic medication would restore Mr. Arena to competency as he has been suffering chronically with symptoms long-term without consistent treatment. (Def.'s Reply to the Gov't's Resp. and the Report on the Def.'s Competency Evaluation at 2, ECF No. 16.)

On November 30, 2021, the Court found that Mr. Arena was not competent and granted the government's motion ordering that he be "committed to the custody of the Attorney General for a period not to exceed 4 months to see if he can be brought back to competency." (Minute Entry, ECF No. 18; Order of Commitment, ECF No. 19.) In its written order, the Court cited Dr. Houghtalen's opinion that:

> Psychoses respond most predictably to antipsychotic medications when
> they are acute. The prognosis for response in a chronic and continuously
> symptomatic condition with fixed delusions is much less optimistic. That
> said, he is largely untreated and could have substantial or partial
> response to properly applied antipsychotic medication, perhaps enough
> to gain traction on restoring capacities necessary to be deemed
> competent to stand trial.

(Order of Commitment at 2, ECF No. 19.) Mr. Arena was not transported to Devens

FMC until March 7, 2022. As of a July 7, 2022, status appearance, four months after

his reception into Devens FMC, the facility had failed to produce a report relating to

whether Mr. Arena could be restored to competency. The Court entered a speedy trial

exclusion and an extension of the four-month restoration timeframe until July 11,

2022, to give the government additional time to contact the facility. (Minute Entry,

ECF No. 35, Jul. 7, 2022; Order at 2–3, ECF No. 36, Jul. 8, 2022.)

On July 11, 2022, when the parties again appeared for a status conference and

no report was yet provided by the facility, the parties requested that the Court issue

a new order pursuant to 18 U.S.C. § 4246, remanding Mr. Arena to the custody of the

Attorney General for evaluation of whether Mr. Arena's mental disease or defect

created a substantial risk of bodily injury to another person or serious damage to the

property or another. (Minute Entry, ECF No. 37.) The order, issued by the Court on

July 25, 2022, directed that the dangerousness report be provided to the Court by

August 5th and that a hearing on the issue would be conducted on August 16th.

(Order, ECF No. 38.)

By letter dated August 2, 2022, the government moved the Court to adjourn

the deadlines relating to the issue of dangerousness and, instead, permit the

government to provide by August 5th the facility's restoration report that the

government anticipated would recommend involuntary medication. (AUSA E. Rodriguez letter to the Court (Aug. 2, 2022) (on file with the Court).)

By letter of August 3, 2022, defense counsel opposed the government's request citing § 4241(d)(2) for the proposition that an initial restoration period must be "reasonable" and that it not "exceed four months" but that any additional period of commitment for restoration must also be "reasonable." (A. Burger letter to the Court (Aug. 3, 2022) (on file with the Court).)

By email of August 4, 2022, the Court requested that the parties submit additional authority addressing the statute's four-month limitation including what, if any, sanction the Court could impose because of a delay by the examining agency. (Email to AUSA E. Rodriguez & AFPD A. Burger (Aug. 4, 2022) (on file with the Court).) By letter of August 4, 2022, defense counsel submitted additional briefing and caselaw in support of Mr. Arena's position. (AFPD A. Burger letter to the Court (Aug. 4, 2022) (on file with the Court).)

In an August 5, 2022, email, and August 10, 2022, order, the Court agreed to vacate the August 5 deadline for a dangerousness evaluation and, instead, convert the August 16th date to an appearance at which the parties would further discuss, among other things, the four-month limitation issue, and whether the Court had the authority to conduct a hearing relating to the forced medication of Mr. Arena. (Email to AUSA E. Rodriguez & AFPD A. Burger (Aug. 5, 2022) (on file with the Court); Order, ECF No. 40.) Following argument on August 16, 2022, the Court scheduled

the case for a *Sell* hearing. (Minute Entry, ECF No. 41, Aug. 16, 2022; Order for *Sell* Hearing, ECF No. 42, Aug. 18, 2022.)

### *Sell* Hearing

The *Sell* hearing commenced on October 6, 2022, with a portion of the testimony of Miriam Kissin, Psy.D., BOP Federal Medical Center ("FMC") Devens Forensic Psychologist. Due to the late disclosure to the defense of some of Mr. Arena's medical and mental health records from Devens, defense counsel requested a continuance to review the material and discuss it with the defense's expert, Rory Houghtalen, M.D., the doctor whom the government had previously retained to conduct the competency evaluation. (October 6, 2022 Transcript at 4–11, ECF No. 49.) Due to further late disclosure by the government of additional, voluminous BOP medical and mental health records for Mr. Arena shortly before the continued hearing was set to resume on Friday, October 28, 2022, defense counsel again requested a continuance to review and discuss the new material with Dr. Houghtalen. (Motion to Adjourn Hearing, ECF No. 48.) The *Sell* hearing was ultimately completed after testimony on November 15 2022, and December 1, 2022. (Minute Entries, ECF No. 52, 55.) As discussed below, the specific expertise and treatment plan of each expert is key to the *Sell* discussion.

### THE *SELL* HEARING

### *Dr. Miriam Kissin*

The government called Dr. Miriam Kissin as its first witness. Dr. Kissin is a forensic psychologist. She has been employed at the BOP FMC Devens as a Forensic Psychologist since March 2009. (Transcript October 6, 2022, at 23, ECF No. 49.) Her

educational background includes a bachelor's in psychology from Clark University and a doctorate in clinical psychology from Antioch University. (*Id*.) Her doctoral work includes an internship at NYU Bellevue in Forensic Psychology. She also completed a year of post-doctorate work at the University of Massachusetts Law and Psychiatry program in Forensic Psychology. (*Id*. at 24.) She is licensed as a Clinical Psychologist. (*Id*.) The Court admitted Dr. Kissin's curriculum vitae into evidence at the hearing as Government's Exhibit 1. (*Id*. at 36–37.) She has testified hundreds of times in court as an expert in psychology. (*Id*. at 40–41.) During her employment as psychologist at FMC Devens, Dr. Kissin has examined, worked with and diagnosed close to five hundred patients. (*Id*. at 41.) At present, Dr. Kissin's work mostly involved competency restoration and, at any given time, she carried approximately twenty patients on her caseload consisting primarily of people suffering from bipolar, schizophrenic disorder, and schizophrenia; half or more of her current cases have schizophrenia. (*Id*. 16–17, 62–63.)

Dr. Kissin testified that Mr. Arena arrived at Devens FMC Butner on March 7, 2022. Before issuing an August 5, 2022, report recommending involuntary medication, Dr. Kissin met with Mr. Arena formally for team meetings lasting between five and fifteen minutes on three occasions: the first on March 22, 2022, the second on May 10, 2022, and the third on July 24, 2022. (Transcript October 6, 2022, at 105.) Based on her training, experience and her contact with Mr. Arena, Dr. Kissin believes that without medication treatment, Mr. Arena's symptoms will continue or get worse over time. (*Id*. at 63–64.)

***Dr. Dean Cutillar***

Dr. Cutillar is employed at FMC Devens as a staff psychiatrist. (Transcript November 15, 2022, at 3). As such, he provides psychiatric care to the general population of inmates. (*Id*.) He also provides psychiatric care to inmates who are severely ill or psychotic. (*Id*. at 3–4.)

Dr. Cutillar received his doctorate in osteopathic medicine from Nova Southeast University. (*Id*. at 5) He did his psychiatric residency at the University of Virginia at Roanoke. (*Id*.) He is licensed as a medical doctor and is board certified in the field of general adult psychiatry. (*Id*. at 6.) He served on active duty in the U.S. Air Force as a staff psychiatrist for five years. (*Id*.) In that capacity, he treated active-duty airmen and their dependents. (*Id*.)

After his five years of active duty as a staff psychiatrist with the Air Force, Dr. Cutillar transferred to the United States Public Health Service Commission Corps, where he holds the rank of Lieutenant Commander. (*Id*. at 7.) He has served in the role from 2008 to the present and has been assigned to the BOP the entire time. (*Id*.) He has worked for BOP for 15 years as a staff psychiatrist. (*Id*.) During the first nine or ten years, he principally worked with the general population in facilities other than medical centers. (*Id*. at 8.) Since 2018, he has worked at BOP medical centers treating more severely ill psychiatric patients. (*Id*.) He has been at FMC Devens for the past two years. (*Id*.)

His training and work for much of his career was in general adult psychiatry, from 1999 until 2018; none of this work involved competency restoration. (Transcript November 15, 2022, at 6–8, 35–37, ECF No. 53.) In April of 2018, Dr. Cutillar began

working at FMC Butner providing care to civil detainees and providing general psychiatric care to other inmates. While at Butner, he participated in "a few" or "five to ten" competency cases. (*Id*. at 39, 41.) Since he began work at Devens in September of 2020, Dr. Cutillar continued to provide general psychiatric care to patients, treatment for civil detainees and participates currently in approximately twenty restoration cases. (*Id*. at 41–42.) Dr. Cutillar stated that he lacked any "training in forensic psychiatry. I can give an opinion on capacity to make decisions, but I don't have training in forensic psychiatry, no." (*Id*. at p. 43.)

During his time as a psychiatrist for BOP, he has worked with and treated at least 1,000 patients. (*Id*.) Dr. Cutillar prepared a report dated July 22, 2022, setting forth his observations and diagnosis of Mr. Arena, and his recommended medication plan. The Court admitted the report at the hearing as Government's Exhibit 3. (*Id*. at 31) In his report, Dr. Cutillar concludes that "Mr. Arena has approximately a 75% chance of restoration with the above medication treatments." While he testified at the *Sell* hearing to a 70 percent chance of restoration, he claims that the difference is based on the variance reflected in different reference books, some finding a 70 percent restoration rate and others finding a 75 percent restoration rate. (*Id*. at 33–34.) He concludes that the likelihood of restoration falls around 70 to 75 percent. (*Id*. at 34.) Specifically, Dr. Cutillar proposes to first administer Haldol, which can be administered in both short-acting and long-acting injectable form. (*Id*.) Dr. Cutillar would begin with a low dosage and slowly increase it. He would start at fifty milligrams once every four weeks. (*Id*.) To gauge whether the Haldol was working

and having the desired effect, Dr. Cutillar and the nursing staff will monitor Mr. Arena's behavior, particularly to note whether his delusions and hallucinations were decreasing. (*Id*. at 20).

Should Haldol prove ineffective or produce dangerous side effects, Dr. Cutillar proposes to use other medications that can be administered in both short-acting and long-acting injection form. (*Id*. at 29–30.) These include Prolixin, Abilify, and Zyprexa. (*Id*. at 30.)

### *Dr. Rory Houghtalen*

The defense's witness was Dr. Rory Houghtalen. He is a clinal professor of psychiatry at the University of Rochester School of Medicine and Dentistry. Since 2016, he has run a private practice where he evaluates and treats patients with both psychotherapy and medication management for a variety of mental health problems including anxiety, depressive and bipolar disorders, schizophrenia, attention deficit disorder, personality and life challenges. Additionally, since 1990 he has worked as a forensic psychiatry consultant for both civil and criminal cases. His civil case experience includes testamentary capacity, contractual capacities, occupational disability, independent medical examinations, guardianship, injury torts, medical malpractice, physician and peace officer fitness for duty, civil commitment, forensic retention and treatment over objection and Article 10 cases.[4] His criminal case experience includes evaluation of capacity to stand trial, criminal responsibility, mitigation and sentencing considerations including more than fifty homicide cases

---

[4] This is likely a reference to New York Mental Hygiene Law Article 10, Sex Offenders Requiring Civil Commitment or Supervision.

(including capital cases), attempted murder, assault, robbery, drug offenses, sexual assault, child pornography and other sexual offenses.

Dr. Houghtalen opined that "the likelihood of restoring [Antonio Arena] to competency is not good." (Transcript November 15, 2022, at 11, ECF No. 54.) He also identified potential side effects which could arise from administration of the medications proposed by Dr. Cutillar.

<em>SELL</em> STANDARD

The Supreme Court has acknowledged that a criminal defendant's liberty interest encompasses the freedom from unwanted, forcible medication with antipsychotic drugs. *Sell v. United States*, 539 U.S. 166 (2003). The Supreme Court has refused to permit involuntary medication except in "rare circumstances." *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 691 (9th Cir. 2010) (quoting *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1138 (9th Cir. 2005)).

The Supreme Court expressly recognized that antipsychotic drugs "can have serious, even fatal, side effects." *Washington v. Harper*, 494 U.S. 210, 229–30 (1990). Because of the "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment," *Id.* at 221, the Supreme Court has demanded "a finding of overriding justification and a determination of medical appropriateness" before an order for involuntary medication may issue. *Riggins v. Nevada*, 504 U.S. 127, 135 (1992).

The importance of the liberty interest at stake demands equally significant procedural safeguards. These safeguards are embodied in the heightened evidentiary standard that applies along with four requirements that the Court detailed in *Sell*

that must *each* be proven before a trial court may order involuntary medication for the purpose of rendering someone competent for trial:

    1. There are important governmental interests in trying the individual;

    2. The treatment will significantly further those interests;

    3. The treatment is necessary to further those interests, considering any less intrusive alternatives; and

    4. The treatment is medically appropriate.

*Sell*, 539 U.S. at 180–81. The Supreme Court emphasized that the four-part standard "will permit involuntary administration of drugs solely for trial competence purposes in certain instances. But those instances may be rare." *Sell*, 539 U.S. at 180.

In *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004) ("*Gomes II*"), the Second Circuit, relying on *United States v. Gomes*, 289 F.3d 71 (2d Cir. 2002) ("*Gomes I*"), *judgment vacated and remanded sub nom Gomes v. United States*, 123 S. Ct. 2605 (2003), determined that, in the context of an application for forcible medication, "the relevant findings must be supported by clear and convincing evidence." In *Gomes I* the Circuit noted that that "the [*Riggins*] opinion's language suggests some form of heightened scrutiny," and adopted "clear and convincing" based on *Riggins* and circuit court opinions in *United States v. Sell*, 282 F.3d 560 (8th Cir. 2002) and *United States v. Weston*, 255 F.3d 873 (D.C. Cir. 2001). *See also, United States v. Bush*, 585 F.3d 806, 814 (4th Cir. 2009) ("A higher standard ... minimizes the risk of erroneous decisions in this important context.... [We] conclude that the government must satisfy the *Sell* factors by clear and convincing evidence."); *United States v. Grape*, 549 F.3d 591, 598 (3d Cir. 2008) ("[A]ll courts of appeals addressing this issue have held that

the Government bears the burden of proof on factual questions by clear and convincing evidence."); *United States v. Payne*, 539 F.3d 505, 508–09 (6th Cir. 2008) ("[T]he risk of error and possible harm involved in deciding whether to forcibly medicate for the purpose of restoring competency are so substantial as to require the government to prove its case by clear and convincing evidence."); *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005) ("[The] *Sell* factors [that] depend upon factual findings...ought to be proved by the government by clear and convincing evidence .... [because of] the vital constitutional liberty interest at stake...."). The Court will discuss each element in turn.

## DISCUSSION

### *(1) Important Governmental Interests in Trying Mr. Arena*

The first element of a *Sell* inquiry requires the government to establish "that important governmental interests are at stake." *Sell*, 539 U.S. at 180. Although the government's interest "in bringing to trial an individual accused of a serious crime is important," *id.*, the Supreme Court cautioned courts to consider the facts and circumstances of the individual case because "[s]pecial circumstances may lessen the importance of that interest." *Id.* In *Sell*, the Supreme Court did not delineate exactly those crimes which courts should consider "serious" or even outline the factors a court should consider when making that determination.

Without more specific guidance, courts are left to fashion appropriate, and presumably objective parameters by which to assess seriousness. Other courts considering whether a crime meets the seriousness requirement have looked to the potential statutory penalty and/or Guideline range of imprisonment which may be

imposed. *See e.g., Gomes II*, 387 F.3d at 160 (noting the defendant faced a mandatory statutory minimum of 15 years imprisonment because of his prior drug convictions, which evidenced congressional view that crime was "serious")*; United States v. Evans*, 404 F.3d 227 (4th Cir. 2005) (holding that maximum statutory penalty of ten years warrants a finding of seriousness to support a *Sell* order).

The government's interest in bringing to trial an individual accused of a serious crime is important. By bringing such as case to trial, the government seeks to protect through application of the criminal law the basic human need for security. *Sell*, 539 U.S. at 180 ("'[P]ower to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace'") (*citing Riggins*, 504 U.S. at 135–36, *quoting Illinois v. Allen*, 397 U.S. 337, 347 (1970)).

### Seriousness

In *Evans*, the Fourth Circuit held that a maximum sentence of ten years is serious "under any reasonable standard." *Evans*, 404 F.3d at 238. The Fourth Circuit suggested that determining the seriousness of the offense by reference to a defendant's probable guideline sentence would be inappropriate, because, among other things, the guidelines analysis must await the preparation of a presentence report. *Evans*, 404 F.3d at 237–38 and n.7. Indeed, the defendant in *Evans* was charged with violating § 115(a)—one of the same violations facing Mr. Arena in this case.

Here, Mr. Arena faces maximum sentences of ten and five years respectively on the two counts alleged in the criminal complaint against him. At sentencing, the Court could determine to run any sentences imposed on counts one and two

concurrently or consecutively. The § 875(c) violation, which carries a lesser maximum sentence of five years imprisonment, may constitute a serious offense under *Sell*. *See, e.g.*, *United States v. Seaton*, 773 F. App'x 1013, 1019 (10th Cir. 2019) (Circuit upheld district court's finding that government established important governmental interest regarding defendant facing maximum of five and ten years for §§ 875(c) and 115 violations, despite possible lower Guidelines sentence); *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014) (O'Connor, Associate Justice, Ret.)[5] (Circuit considered likely Guidelines sentence of 33–41 months serious); *United States v. Nicklas*, 623 F.3d 1175, 1178 (8th Cir. 2010) (Defendant did not dispute that transmitting a threatening communication in interstate commerce is certainly a serious offense).

Defense counsel contends that Mr. Arena faces a Zone A advisory sentencing guidelines range of zero to six months imprisonment following trial based on a total offense level of eight and a Criminal History Category of I. Similarly, if Mr. Arena plead guilty to the offense and received a two-level reduction for acceptance of responsibility, he would face a Zone A guidelines range of zero to six months based on a total offense level of six, meaning that Mr. Arena, having been held for over twenty-one months pending the resolution of this case, he has more than served his time. Nevertheless, this argument does not contemplate any term of supervised

---

[5] Hon. Sandra Day O'Connor, Associate Justice (Ret.) for the Supreme Court of the United States, sitting by designation.

release that the sentencing judge might impose, which the Circuit Court in *Seaton* reflected was an important consideration.

Based on this information the Court determines that the government has shown by clear and convincing evidence that there is an important governmental interest in trying Mr. Arena.

### (2) Proposed Treatment Significantly Furthering Government's Interest

Presuming the first element is met, the second *Sell* factor is whether the proposed treatment will significantly further the government's interests, and whether the medication is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist in his defense. *Sell*, 539 U.S. at 181. In making this determination, the Court must consider whether the medical treatment proposed by the government is "substantially likely to render [the defendant] competent to stand trial and ... substantially unlikely to have side effects that will interfere significantly with his ability to assist in his defense." *Gomes II*, 387 F.3d at 161. Nevertheless, it does not follow that "because the use of a product is designed to accomplish an end, it does so. Nor does it follow that it is substantially likely that it will do so, let alone substantially unlikely that it will have unintended adverse effects." *United States v. Ruiz-Gaxiola*, 623 F.3d 684 (9th Cir. 2010) (reversing a district court order requiring medication under *Sell*). In *Ruiz-Gaxiola* the Ninth Circuit reasoned that because *Sell* "requires the government to demonstrate, by clear and convincing evidence what it is likely that the involuntary medication regimen will do … the government cannot satisfy that burden by showing what the involuntary mediation regimen is designed to do." (*Id.*) As the Court examined below,

18

the treatment would significantly further the government's interest, *only* so long as the treatment restores Mr. Arena back to competency.

### *Defense Counsel's Contentions Against Drs. Cutillar's and Kissin's Treatment Plan*

The government contends that Dr. Cuttiar's testimony is sufficient to show that the proposed treatment will significantly further the government's interests and that the medication is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist in his defense. (Gov't Mem. in Supp. at 20, ECF No. 61.) The government states "[h]ere, Dr. Cutillar testified that the proposed course of treatment has a 70–75 percent success rate." (*Id.*) The Second Circuit cited with approval in *Gomes II* the BOP's 70 percent success rate as satisfying this requirement. *Gomes II*, 387 F.3d at 161–62. Concerning side effects, the Second Circuit found that antipsychotic medications that "reduce or eliminate" the defendant's delusions and thereby enable the defendant to communicate better with his attorney, along with the low risk of side effects, support a finding that involuntary medication would significantly further the government's interest. *Id.* at 162.

Dr. Cutillar recommended that Mr. Arena be subject to a trial of antipsychotic medication "and perhaps mood stabilizing medication." (*See* Gov't Ex. 3 (on file with the Court.) Dr. Cutillar's July 22, 2022, Patient Report (Gov't Ex. 3) limits the details of his recommended course of treatment to "trials of Haldol or Prolixin initially.... In the case that if neither Haldol nor Prolixin result in an adequate treatment response, then trials of Abilify and lastly Zyprexa will be undertaken." (*Id.* at 2.) He offered no

testimony on the dosages in his report, nor does he provide in his report  information about how long each medication trial would last or what factors would result in an adequate treatment response. During the in-court testimony, defense counsel questioned Dr. Cutillar concerning a starting dose, to which he replied it would be 50 milligrams every four weeks. (Transcript November 15, 2022, at 25.) Regarding his proposed medication regime, Dr. Cutillar offered very few specifics as to the medications' dosages and the length of the trial aside from his claim that he would begin with short-acting and then, barring negative reactions, move on to long acting. (*Id*. at 18–20, 30.) He estimated that the trial medication process would take one to two months at least. (*Id*. at 59.)

Dr. Cutillar offered the opinion that antipsychotic medication "will most likely decrease [Mr. Arena's] preoccupation with paranoid and grandiose delusions and improve control over his impulsivity. A mood stabilizer will help to decrease grandiose preoccupation and decrease episodes of severe depression or severe manic symptoms." (*Id*. at 1.) Dr. Cutillar also offered the conclusion that "Mr. Arena has approximately a 75% chance of restoration" with his recommended course of treatment. (*Id*. at 2.) Although in his report and during cross-examination he stated that Mr. Arena has a 75 percent chance of restoration, during his testimony, Dr. Cutillar also testified that Mr. Arena had a 70 percent likelihood of recovery. (Cutillar Patient Report at 2, July 22, 2022, (on file with the court); Transcript November 15, 2022, at 23, ECF No. 54.)

For much of Dr. Cutillar's testimony, rather than adopt the claim from his report that there was a 75 percent chance that Mr. Arena would be *restored to*

*competency* if the Court ordered his recommended course of involuntary medication, he testified that there was a 70 or 75 percent chance merely of *improvement of psychotic symptoms*. (*Id*. at 23, 33-34, 54, 64, 80, 81.) Dr. Cutillar stated that the 75 percent figure did not relate to competency restoration cases at all but rather improvement of psychotic symptoms; this statement came from handbook titled "Management of Complex Treatment-resistant Psychotic Disorders." (Transcript November 15, 2022, 53–58, ECF No. 54.)

Dr. Cutillar explained that, because the handbook provides that "'Approximately 30 percent of people with schizophrenia do not respond to antipsychotic therapy and meet criteria for treatment resistant schizophrenia….' So, from that, I gather that 70 percent of patients do respond to antipsychotic therapy." (Transcript November 15, 2022, at 54, ECF No. 54.) Dr. Cutillar stated that, among those schizophrenics who would respond to the treatment, there is a wide range of responses; some may find they are close to being cured, others may find that only some of their delusions are reduced. (*Id*. at 56–57.) Thus, it stands to reason that of the 70 percent who do respond to treatment, some amount of them are still not brought back to competency, thus making both the 70 percent and 75 percent chances at restoration improbable.

In addition, defense counsel argues that the Court should reject Dr. Cutillar's recommendations for involuntary medication on several grounds. (Def.'s Mot. in Opp. at 34–35, ECF No. 63.) Defense counsel states that the doctor's professional

qualifications are insufficient to support his opinion and his opinion that involuntary medication is substantially likely to result in Mr. Arena's restoration is unreliable.

Defense counsel argues that the Court should disregard Dr. Kissin's opinion as to the likelihood of restoration because it is unreliable. Dr. Kissin's analysis is largely similar to Dr. Cutillar's, to the point that the parties lump the two doctors' conclusions together. In support of her contentions, defense counsel relied primarily on Dr. Houghtalen's testimony, which the Court will now review.

### Dr. Houghtalen's Position

The government raises concerns about Dr. Houghtalen's assessment that psychotic patients have a much lower positive outcome than stated by the government. During cross-examination, the prosecutor questioned Dr. Houghtalen about the claim in his October 3, 2022, letter report to defense counsel (and repeated during his direct examination at the *Sell* hearing) that the medical literature established that only 23 percent of psychotic patients had a "good" response or outcome from antipsychotic medication. On cross-examination, Dr. Houghtalen conceded that none of the other articles referenced in his October 3, 2022, letter to defense counsel cited to this 23 percent figure. (Transcript December 1, 2022, at 67, 117–18, ECF No. 56; Def. Ex. E, Houghtalen Report on Restoration (on file with the Court).) The other articles cited by Dr. Houghtalen found a much higher success rate for antipsychotic medications; however, those articles do not solely deal with restoring competency. (Transcript December 1, 2022, at 117, ECF No. 56.)

The prosecutor, Mr. Rodriguez, examined Dr. Houghtalen concerning the meaning of "success" in anti-psychotic treatment:

Q. But the Mossman[6] article that we talked about a fair amount during cross, is specifically about restoration of competency. Isn't that right?

A. Yes.

MR. RODRIGUEZ: I forget what exhibit number this is, Doctor. But I'm going to put this on the screen.

Q. And the title of it is "Predicting restorability of incompetent criminal defendants." Is that right?

A. Yes.

Q. So, this article is not just about improving the condition of people who suffer psychotic disorders, this article is specifically about restoring competence, correct?

A. Yes, that is what was said.

Q. And, again, this will be the last time I beat this dead horse. You keep referring to the literature, Doctor, as providing this 23 percent figure that the only article that you cited in your papers and that you've identified in this proceeding is that meta-analysis article, the one. Correct?

A. I'm not sure how to answer. It's the only citation I've made of the percentage of 23, yes.

Q. And that percentage of 23 is quite different from the percentages that we went through earlier in that Mossman chart showing restored versus not restored, correct?

A. Correct. But they have two very different issues that are being percentages there.

Q. Right. In the Mossman article, the issue is restoration of competence, right?

A. Yes, not degree of response to an antipsychotic.

---

[6] Mossman, D. (2007) Predicting Restorability of Incompetent Criminal Defendants. J Am Acad Psychiatry Law 35:34-43.

(Transcript December 1, 2022, at 117–118, ECF No. 56.) Thus, while *Chorchrane*[7] states there is a higher rate of restoration, it seems to be an anomaly:

> The Cochrane paper (2013) reports restoration rates of defendants with psychotic disorders between 73.3 and 92.9 % depending on diagnosis; for schizophrenia the probability of 76.5% was cited. The authors wrote: " The consistently high response rate to antipsychotic medications treatment in defendants with various psychiatric diagnoses was remarkable" . I agree. This level of treatment response is to my knowledge unprecedented and unreplicated in a considerable literature about expected rates of response of psychotic conditions to antipsychotic medications. Commenting on the weakness of the study, the authors wrote, "The usual limitations of a retrospective document review apply to this data set. Standard intervention to reduce bias, such as random assignment to assigned treatment groups and the use of a placebo control group, were not possible in this study. As a result, the opinions of the examiners may have been biased in favor of finding a positive response to treatment.

(Houghtalen Report at 11, October 3, 2022 (on file with the Court.)) Conversely, Dr. Houghtalen relied on *Mossman*, which was a metanalysis of "sixty years of data on randomized controlled trials of antipsychotic medications in the treatment of schizophrenia [that] found that *only 23% of psychoses have a 'good' response to antipsychotic medication while 51% have a 'minimal response.'*" (Houghtalen Report on Restoration, Def. Ex. E) (emphasis added).) While "[a]ntipsychotics are the only 'arrow in the quiver' to treat psychosis, [ ] the degree of expected efficacy is modest and there are a host of important side effects to balance in selecting treatment." (*Id.*)

Dr. Houghtalen also cited a retrospective chart review of 351 defendants confined in a single Ohio state hospital from 1995 to 1999 that was conducted in the

---

[7] Cochrane, RE, et al. (2013) The Sell Effect: Involuntary Medication Treatment Is a "Clear and Convincing" Success. Law and Human Behavior 37: 107–116.

hopes that factors could be identified to assist in predicting the likelihood of competency restoration. (*Id*. at 10.) The reviewer "cautioned against using [their] predictive equations to calculate probabilities of restoration" given the limited sample size and slim timeframe. (*Id*.) Among the reviewer's observations, however, was that the presence of psychotic conditions, "irremediable cognitive disorder," or a "long-standing psychotic disorder that has resulted in lengthy periods of psychiatric hospitalization," negatively affect the likelihood of attaining competency with psychiatric treatment. (*Id*.)

Another study cited by Dr. Houghtalen concluded that "[t]he typical nonrestorable defendant had slightly lower-level charges; was diagnosed with psychotic illness, low cognitive functioning, or both; was prescribed more medications and had a history of prior episodes of incompetence." (*Id*.)

Following his assessment of a variety of studies and case reviews, Dr. Houghtalen concluded that:

> [r]eliable literature tells us that there is a 23% probability of a 'good' response to antipsychotic medication in the typical patient with schizophrenia. Mr. Arena's long-standing psychosis tempers that probability. The available data suggest that Mr. Arena falls in that category of defendant patients who have a well below average expectation of competency restoration given the diagnosis of schizophrenia, and the long duration of untreated psychotic symptoms.

(*Id*. at 11.) Additionally, Mr. Arena poses several additional case specific factors that make treating him uniquely difficult.

Dr. Houghtalen testified that because Mr. Arena's delusions focused on the government, his delusions,

engulf[] the very process that we're in the midst of, is so strong and so abiding, I mean it's been present for at least a decade, it would appear. And he has had very little in the way of treatment .... So he is truly someone who has very long duration of untreated psychosis. He has very intense delusional ideas that engulf the very process and system that he faces here. One would expect him to have to have a very substantial improvement in his delusional beliefs to restore him and I am skeptical that that is going to happen.

(Transcript November 15, 2022, at 39–40.) Although Dr. Houghtalen agreed that medication might tone down Mr. Arena's delusions "a bit," he had "serious[ ] doubt that the fire of the actual delusional belief is going to be eliminated in a way that is going to allow him to be restored." (*Id*. at 40.) Other factors that influenced Dr. Houghtalen's opinion included Mr. Arena's age, some apparent significant cognitive impairment, and a possibly serious head injury at one point; "these three things are all factors that, in the literature about restoration, are negative prognostic indicators." (*Id*. at 40–41.)

Should the treatment be successful in returning Mr. Arena to capacity to stand trial, the treatment would further the government's interests. However, the Court concludes that the government has not shown by clear and convincing evidence that the treatment proposed is likely to return Mr. Arena to capacity. Further, as the Court will discuss below, the proposed treatment may cause Mr. Arena harm.

### (3) Treatment Necessity to Further Government Interests, Considering Any Less Intrusive Alternatives

If the government has met the first and second *Sell* factors, then the Court must consider the third factor: has the government established that no less intrusive treatments are available to achieve restoration? *Sell*, 539 U.S. at 181. If less intrusive treatment options, such as verbal therapy (*i.e.*, psychotherapy) would *not* work, this

factor is satisfied. *Gomes II*, 387 F.3d at 162–63. The testimony of all three doctors conclusively established that no other less intrusive alternative treatments were available.

### (4) Medical Appropriateness of Treatment

The Supreme Court's *Sell* test calls for a finding "that the administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181. An important distinction of this element is the concern for the patient's best medical interest, not the interest of the prosecution. The Ninth Circuit opined in *Ruiz- Gaxiola* that the Supreme Court used language requiring this Court to "consider the long-term medical interests of the individual rather than the short-term institutional interests of the justice system." *Ruiz-Gaxiola,* 623 F.3d at 703.

Part of determining appropriateness of a treatment is weighing the medical consequences and side effects of the proposed course of treatment. Mr. Arena suffers from diabetes, renal failure, hypertension, hepatitis C, and liver and pancreas damage. Aside from the side effects any user of these drugs faces, Dr. Houghtalen has stated the recommended drugs will likely aggravate Mr. Arena's diabetes, expose him to cardiovascular risk, and tax his already compromised kidney, liver and pancreas.

Dr. Houghtalen further opined on the known risks and side effects associated with the psychotropic medications being proposed, including neuromuscular effects, disturbance in glucose metabolism and aggravation of diabetes, increased risk of cardiovascular disease, acute dystonic reactions, akathisia, extrapyramidal, tardive dyskinesia, and neuroleptic malignant syndrome. (Houghtalen Report on

Restoration, at 12–14, Def. Ex. E (on file with the Court); Transcript December 1, 2022, at 119, ECF No. 56.) He also identified risks that would be particularly relevant to Mr. Arena as someone who suffers from Type II Diabetes Mellitus, hypertension and chronic hepatitis C and flagged a variety of "inaccurate" or "underdeveloped" claims Dr. Cutillar made with respect to treatment selection and side effects. (Houghtalen Report on Restoration, at 13–17.)

Dr. Houghtalen offered the opinion that Mr. Arena's "long duration of untreated psychosis is likely to significantly limit the potential effectiveness of antipsychotic medications making it difficult to impact the fixed delusions that incapacitate him." (*Id.* at 17.) He also pointed out that,

> [g]iven the nature of his delusions about implanted devices, I believe he will be more frightened about the prospect of having injection-based treatment than many patients would be. It is important to consider that he may be injured in the attempt to apply injectable treatment over his objection if he offers resistance.

(*Id.* at 18.) While at Devens, Mr. Arena consistently denied that he suffered from a mental illness, and refused medication when offered, at times becoming angry, screaming and yelling. (Transcript November 15, 2022, at 55, 84–85.)

Dr. Kissin testified that discussions with Mr. Arena about medication were "always a source of distress for him." (Transcript October 6, 2022, at 55, 84–85 .) Mr. Arena's delusions were focused on the government; he complained that the government, including members of the U.S. Attorney's Office, the federal judiciary, and local law subjected him to such treatment as implanting something in his body against his will. (*Id.* at 41–44; *see also* Def. Ex. D.)

Dr. Cutillar acknowledged that increased stress can negatively impact the symptoms of people suffering from schizophrenia. Subjecting a schizophrenic individual to physical coercion could aggravate the symptoms of schizophrenia and lead to decompensation. (Transcript November 15, 2022, at 45–46.) Dr. Cutillar went on to describe the way staff at Devens FMC would forcibly administer psychotropic medication: five or six employees would approach the inmate at the same time, each one assigned to hold down one of the inmate's extremities with his clothing forcibly removed before the injection. (*Id*. at 47–49, 52.) He conceded that there is a risk of injury and danger associated with forcibly medicating someone. (*Id*. at 50.) Following the forced injection, the inmate's hands and legs are cuffed to restrain him or her as the inmate is put in a special, wheeled chair. (*Id*. at 50–51.)

Dr. Cutillar was dismissive of the side effects associated with psychotropic medication including neuroleptic malignant syndrome, cardiovascular issues, the aggravation of diabetes mellitus, and the aggravation of metabolic syndrome. (*Id*. at 65–66.) In response to questions about Mr. Arena having had a known allergic reaction to Abilify (aripiprazole, a second-generation antipsychotic) in the past, Dr. Cutillar stated "I think that was documented once on the document supplied by his primary care physician, Dr. Nead." (*Id*. at 68.) Dr. Cutillar also stated that Mr. Arena told him he suffered a swollen tongue and had difficulty swallowing in conjunction with psychotropic medication several times in the past but "he is never specific as to which antipsychotic has caused this reaction, so, we really need to know which medication it is that caused the reaction at this point." (*Id*. at 69.)

29

Dr. Cutillar interpreted these symptoms as an "extrapyramidal symptom" or "dystonia" that he stated was a reaction seen most often with first-generation antipsychotics like Haldol and Prolixin in higher potencies. (*Id*. at 69.) Dr. Cutillar also stated that he had omitted some of the medications' possible side effects in his July 2022 report to the Court but "the ones I mentioned are really the most common, 80 to 95 percent of time these occur." (*Id*. at 72.)

Regarding general side effects, Dr. Houghtalen identified each of the side effects associated with the psychotropic medications recommended by Dr. Cutillar (Haldol, Prolixin, Abilify and Zyprexa) to include acute dystonia, extrapyramidal symptoms, akathisia, tardive dyskinesia, neuroleptic malignant syndrome, elevated triglycerides and glucose, and elevated cardiovascular risk. (October 2022 Report, at 20–30. (on file with the Court.)) Additionally, Dr. Houghtalen rejected Dr. Cutillar's opinion that Haldol and Prolixin have greater efficacy than other antipsychotic medications and that they come with greater safety or less risk, "It is rarely used today outside of emergency circumstances for things like treatable injection because it's, in fact, not tolerated by most people." (Transcript December 1, 2022, at 20, 30–31, ECF No. 56.) Haldol and Prolixin, explained Dr. Houghtalen, are much cheaper than other drugs but are rarely used nowadays because of their side effects and a greatly increased risk of dyskinesia. (*Id*. at 31–32.)

Regarding appearance-related side effects of the proposed medications, Dr. Cutillar admitted that there was the possibility of a blunting of Mr. Arena's facial expressions, tardive dyskinesia consisting of hyper-kinetic movements first

appearing in the face, lips or tongue and eventually graduating to writing, rocking and other types of movements. (*Id*. at 89.) The frequency of occurrence is a five percent risk per year with high doses of psychotropic medication and the risk goes up to 10 to 25 percent among older adults. (*Id*. at 90.) Mr. Arena is age 58.

Dr. Houghtalen also expressed skepticism about the proposed dosage of Haldol recommended by Dr. Cutillar during his direct testimony:

> Q. Dr. Cutillar also mentioned that he would start with a 50 milligram dose as what he called a low dosage. I had asked you some questions about that when we began last time, but, I was looking for some clarification. Could you explain what your view of 50 milligrams as a low dose of Haldol?
>
> A. Well, I wouldn't consider 50 milligrams a low dose? [sic]He was talking about Haldol decanoate. Haldol decanoate, generally, forgetting treatment over objection or treatment in, say, an ambulatory patient with schizophrenia, you would figure out what oral dose is useful or well tolerated. And, generally speaking, doses of Haldol more than 5 or 10 milligrams are not any more helpful than lower doses. We've learned over time that high doses of Haldol doesn't extinguish refractory symptoms and predictably and generally leads to more and more side effects. So, the dose of Decanoate is generally 10 to 20 times whatever the daily oral dose was. So, five would become, you know, possibly 50. But what we don't know, what I don't know, and Dr. Cutillar could speak to, is how many times or what kind of dose of short-acting injectable Haldol was he going to test to then roll up into a Decanoate dose. If you look at most of the data about Haldol Decanoate, the suggested starting dose is 12 and a half to 25. So, in my view, it's on the high side of an initial dose, especially for somebody who is probably going to be relatively naive to the drug, as I'm assuming, and he could clarify, that they are going to give him a dose or two of immediately injectable, and then decide on a Decanoate dose, so they don't have to continue to give him repeated injections and have the battle over that.

(Transcript December 1, 2022, at 20–21, ECF No. 56.)

***United States v. Boima***

The Government states that a similar case in this District resulted in involuntary medication, citing to *United States v. Boima*, No. 20-MJ-4136, 2023 WL 334339 (W.D.N.Y. Jan. 19, 2023).[8] However, upon its review of the *Boima* case, the Court finds that the two cases differ in key aspects rendering *Boima* distinguishable.

In *Boima,* the district judge issued a decision and order granting the government's motion for authorization to involuntarily medicate a criminal defendant who had been found to be incompetent to stand trial and who had refused to be voluntarily medicated to be restored to competency. Boima was charged with assaulting a federal officer. Boima had been diagnosed as suffering from schizophrenia. Two Bureau of Prisons doctors submitted reports and testified at the *Sell* hearing before the district judge that there was a substantial probability that Boima's competency to stand trial could be restored with appropriate medication, specifically haloperidol (Haldol).

One of the doctors opined that the proposed medication had a 70 percent to 80 percent likelihood of successfully restoring Boima to competency. The district judge acknowledged possible side effects from the medication but noted that the side effects could be monitored and treated.

While both Mr. Arena and Boima  suffer from the same disease, the facts are so particularized in each case that a direct comparison is impossible. The *Boima* case

---

[8] The defendant filed a Notice of Appeal on February 2, 2023, the same day the district court denied a stay of its order. On April 5, 2023, the United States Court of Appeals for the Second Circuit issued a stay of the district court's order pending disposition of the appeal. Order, *United States v. Boima*, No. 23-6115 (2d Cir. Apr. 5, 2023, ECF No. 16.1).

differs greatly from Mr. Arena's in that in *Boima* no opposing medical opinion was offered.

## CONCLUSION

As stated above, the government has not proven all elements of the *Sell* test. The government has shown by clear and convincing evidence that (1) there are important governmental interests in trying the individual; and (3) the treatment is necessary to further those interests, considering any less intrusive alternatives. However, the Court determines that the government has not shown by clear and convincing evidence that (2) the treatment will significantly further the government's interests, and (4) the treatment is medically appropriate.

Mr. Arena has been incarcerated since August 26, 2021, 643 days or just over 21 months. The likelihood of a person such as Mr. Arena being returned to capacity from this treatment appears to be closer to twenty-three percent, not seventy or seventy-five percent. The government has not shown the treatment is medically appropriate, as Mr. Arena has several health issues that would likely be exacerbated with possibly serious side effects that might irreparably damage his organs.

For the reasons stated above, the undersigned recommends that the district judge deny the government's motion to involuntarily medicate Mr. Arena. Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and

Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.

The district court will ordinarily refuse to consider on de novo review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order***. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

DATED:      May 31, 2023
            Rochester, New York

_____
MARK W. PEDERSEN
United States Magistrate Judge